Zimmerman, J.
A decision in this case turns on an inter - pretation of the prenuptial agreement between Pauline Troha and the decedent and on the surrounding facts existing before and after its execution and following the death of Philip.
The bill of exceptions, consisting of stipulations of opposing counsel, evidence and exhibits, discloses that in 1946 Philip Troha and Paulina or Pauline Yerkic, being adult persons and each having a substantial amount of property and each having four grown children by prior marriages, decided to enter the bonds of matrimony. On July 29, 1946, Philip Troha, as party of the first part, and Paulina Yerkic, as party of the second part, executed a prenuptial agreement, witnessed and notarized, the material parts of which read as follows:
“Whereas, each is seized of property real and personal, said parties have agreed and do hereby agree as to their property as follows:
“Now, therefore, in consideration of said marriage and of the covenants of the said first party and second party hereinafter contained, the said first party hereby covenants and agrees to relinquish all right, title, interest, or claims of dower, in and to the real property of said second party now owned or hereafter acquired, and in lieu of any and all rights or claims to a distributive share of said second party now owned or hereafter acquired and in lieu of any and all rights or claims in or to the estate of the said second party which may arise by virtue of said marriage.
“And the said second party, in consideration of said marriage and of the covenants of said first party hereinafter contained, covenants and agrees to relinquish all rights or claims of dower in and to the real property of said first party now owned or hereafter acquired, and in lieu of any and all right, title, interest, or claims to a distributive share of first party’s personal property now owned or hereafter acquired, and in lieu of any and all rights or claims in or to the estate of the said *400 first party which may arise or accrue by virtue of said marriage, and both parties mutually agree that at no time will they claim any right, title or interest in the real or personal property now owned by them previous to their marriage, and in the event either party to this agreement should sell any of their real property and acquire other real property, each party to this agreement waives all their right, title and interest in and to the same, and that at the death of either party to this agreement said real property shall go to the children of the respective parties to this agreement.
“It is further agreed that each party to this agreement shall pay their own taxes, insurance and upkeep of their own premises.
“It is further agreed by and between the parties to this agreement that in the event either one of the parties desires to sell their property that the other party- will join in a warranty deed or such other instrument of conveyance as may be necessary to release all the right, title and interests that he or she may have in the property of the person selling the same.
“It is further agreed by and between the parties that each party shall collect their own rentals- to their respective properties.
“It is further agreed by and between the parties to this agreement that in the event there should be a dissolution of this marriage, either by law or by death, that then the respective parties to this agreement agree to give instruments of conveyance releasing any and all of their right, title and interest in each other’s property.
“This agreement is made for the benefit of the heirs, executors, administrators and assigns of the parties to this agreement and shall be binding upon them.”
The marriage took place on August 3, 1946. In 1953, Pauline sold a house she owned for approximately $10,000, and Philip signed the deed with release of dower, etc. Out of the proceeds of sale Pauline gave each of her four children the sum of $2,000 and retained the balance.
*401 Philip and Pauline decided on a trip to Europe in the summer of 1957. In late June, he withdrew $2,058.78 from a joint and survivorship bank account, carried in the names of himself and his son, to pay expenses connected with the trip. Philip and Pauline embarked for Paris on July 1 by airplane, and he died during the flight. On July 2, his children were advised of his death by cablegram from Paris. Although it is not wholly clear, the conclusion seems warranted that through a Cleveland undertaker the Troha children made arrangements for the return home of their father’s body for burial, and that the total funeral expenses amounted to $2,169.98.
Pauline continued on the European trip, apparently exhibiting little interest concerning her husband’s remains or his funeral. If she disclosed her whereabouts, such fact does not appear from the evidence. At any rate, she did not return to America until about the middle of October 1957, and she was not a witness in the Probate Court hearing.
Angela Snefler, daughter of the decedent, applied for letters of administration of her father’s estate on July 17, 1957, and she was appointed administratrix on July 29, furnishing bond in the sum of $4,000. The application named the widow and gave her usual address. The administratrix, without an attorney, proceeded regularly with the administration of the estate. However, there was no citation by the Probate Court to the surviving spouse according her the privilege of accepting or declining administration. It was the view of the Court of Appeals that, by her conduct and protracted absence, the widow forfeited any right she may have had to administer her deceased husband’s estate, and, furthermore, that under the terms of the prenuptial agreement she possessed no interest in the estate which entitled her to administer it.
The Court of Appeals also held that by the clear and unambiguous language of the prenuptial agreement each of the parties thereto surrendered and relinquished all possible rights in the property of the other. In reaching this conclusion, the court used the following language in the opinion:
*402 “The agreement, as above quoted, in part, wherein it is provided: ‘and in lieu of any and all rights or claims in or to the estate of the said first party [Philip Troha] which may arise or accrue by virtue of said marriage’ is as complete a waiver of all of the statutory benefits of the appellee in the estate of her husband. Three separate phrases are used in the agreement to define what the ‘second party’ was giving up for the benefits to her in releasing her property from any claims of the first party as a result of the contemplated marriage. They were ‘all rights or claims of dower * * ‘all right, title, interest, or claims to a distributive share of first party’s personal property * * and, ‘all rights or claims in or to the estate of said first party which may arise or accrue by virtue of said marriage.’ As just indicated, the last phrase is all inclusive and was intended to release every right accruing to or conferred upon appellee by law in and to the property of Philip Troha upon his death after the marriage was consummated.”
Although strong and unmistakable language in a prenuptial agreement is necessary to deprive a surviving spouse, and particularly a widow, of the special benefits conferred by statute, we think that the agreement herein was designed and intended to do just that, and that it was the plain intention of the parties to accomplish that object.
We know of no public policy in Ohio and no statutory enactments or court decisions which prevent the parties to a prenuptial agreement, situated as were Philip and Pauline, from cutting one another off entirely from any participation in the estate of the other upon the death of either.
The judgment of the Court of Appeals is affirmed.

Judgment affirmed.

Weygandt, C. J., Taft, Matthias, Bell, Herbert and Peck, JJ., concur.